<u>NOT FOR PUBLICATION</u>

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

```
FILED
JAMES J. WALDRON, CLERK

December 24, 2008

U.S. BANKRUPTCY COURT
NEWARK, N.J.
BY: /s/Diana Reaves, Deputy
```

```
_____
                                    :
IN RE:                              :    CHAPTER 11
                                    :
EnCap Golf Holdings, LLC and NJM    :
Capital, LLC,                       :    CASE NO.:  08-18581  (NLW) and
                                    :               08-18590  (NLW)
              Debtor.               :    Jointly Administered
                                    :
_____  :    OPINION
```

**Before:**     **HON. NOVALYN L. WINFIELD**

<u>A P P E A R A N C E S :</u>

Paul Kizel, Esq.
Lowenstein Sandler, PC
65 Livingston Avenue
Roseland, NJ 07068
Attorneys for New Jersey Meadowlands Commission

David Bass, Esq.
Cole, Schotz, Meisel, Forman & Leonard
Court Plaza North
25 Main Street
Hackensack, NJ 07601
Attorneys for Debtor

Louis T. DeLucia, Esq.
Greenberg Traurig, LLP
200 Park Ave
Florham Park, NJ 07932
Attorneys for Official Committee of Unsecured Creditors

Warren J. Martin, Jr., Esq.
Porzio, Bromberg & Newman
100 Southgate Parkway
Morristown, NJ 07962-1997
Attorneys for Cherokee Investment Partners III, L.P.
and Cherokee Investment Partners III Parallel Fund, L.P.

Before the court is a motion by the New Jersey Meadowlands Commission ("NJMC") under 11 U.S.C. § 365(d)(2) to compel EnCap Golf Holdings, LLC, et al. ("EnCap") to assume or reject the Agreement for Purchase and Sale of BCUA/Transit Site, Baler Site, and 1-E Landfill Lease dated August 9, 2006 ("Phase 2 Purchase Agreement").  As set forth below, the court grants the motion to the extent that EnCap shall be required to assume or reject the Phase 2 Purchase Agreement on or before January 27, 2009.

## JURISDICTION

The following constitutes the bankruptcy court's findings of fact and conclusions of law as required by Federal Rule of Bankruptcy Procedure 7052.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A).  The Court has jurisdiction to determine this matter under 28 U.S.C. § 1334 and the Standing Order of Reference issued by the United States District Court for the District of New Jersey on July 23, 1984.

## STATEMENT OF FACTS

EnCap's Chapter 11 case and the NJMC's motion under § 365(d)(2) are merely the most recent developments in the effort by the parties to remediate and develop certain property in the Hackensack meadowlands (the "Meadowlands").   The facts set forth below are largely undisputed and provide context for both the case and the motion.

EnCap and the NJMC entered into a landfill closure and development agreement dated October 26, 2000 ("Original Development Agreement") pursuant to which EnCap agreed to close, cap and develop landfills on a site comprising approximately 785 acres in the Boroughs of North Arlington and Rutherford and the Township of Lyndhurst ("Phase 1 Project Site").  The Original Development Agreement has been amended and restated in its entirety on three occasions: (i) March

10, 2003 ("Amended Development Agreement"), ii) September 20, 2005 ("Second Amended Development Agreement") and (iii) August 9, 2006 ("Third Amended Development Agreement").

Under the Original Development Agreement EnCap was granted an option ("Phase 2 Option") to redevelop certain additional property encompassing 425 acres in the Borough of North Arlington known as the 1-E Landfill Site. Within the 1-E Landfill Site is a smaller tract known as the Baler Site that contains a functioning solid waste baler. As reflected in the Amended Development Agreement, EnCap exercised the Phase 2 Option. Subsequently, and in connection with the Second Amended Development Agreement, EnCap and the NJMC entered into a memorandum of agreement ("Phase 2 MOA") that specified some of the obligations that each party assumed with regard to the Phase 2 Project Site. Among the rights and obligations under the Phase 2 MOA were the following: (i) NJMC agreed to sell the BCUA/Transit Site and the Baler Site to EnCap and EnCap agreed to be responsible for the remediation of the sites; (ii) NJMC undertook the work of filling, closing and developing the 1-E Landfill, (iii) NJMC granted EnCap a non-possessory leasehold interest in the 1-E Landfill; and (iv) EnCap agreed to pay, over a period of time, $33,700,000 to NJMC on account of the closure and post-closure expenses to be incurred by NJMC with respect to the 1-E Landfill Site and for EnCap's lease of the solid waste facilities, as well as the environmental infrastructure and improvements located at the 1-E Landfill Site.

It appears that because of the problems and cost overruns that EnCap experienced in remediating the Phase 1 Project Site, EnCap was not able to fully meet its obligations regarding the Phase 2 Project Site. Thus, in August 2006 the Third Amended Development Agreement between EnCap and the NJMC did not include treatment of the Phase 2 Project Site. Rather, on August 9, 2006, the Phase 2 Purchase Agreement that is the subject of the present motion was executed by EnCap and the NJMC. Like the Phase 2 MOA, the Phase 2 Purchase Agreement provides for a 99-year lease of the 1-E Landfill Site and the sale of the BCUA/Transit Site and Baler Site to EnCap.

3

Additionally,  § 3.2.2 of the Phase 2 Purchase Agreement obligates EnCap to pay to the NJMC the sum of $33,700,000 as a "1-E Site Remediation Contribution," payment of which is amortized over a seven year period commencing March 31, 2007.

To insure payment of the 1-E Landfill Site Remediation Contribution, § 3.2.2.2 of the Phase 2 Purchase Agreement provides for a guaranty from Cherokee Investment Partners III, L.P. and Cherokee Investment Partners III Parallel Fund, L.P. (collectively "Cherokee").   Cherokee and EnCap claim that the guaranty was given with the expectation that EnCap's rights under the Phase 2 Purchase Agreement would be immediately transferred to a Cherokee affiliate.  Section 3.2.4 of the agreement explicitly memorializes this understanding.  For reasons not yet clear, this transfer of  EnCap's rights has not occurred and in October 2008 Cherokee filed an adversary proceeding against the NJMC seeking, *inter alia*, to declare the guaranty unenforceable.  The court presumes that the dispute between Cherokee and the NJMC is the reason that the $1,433,889 payment for EnCap's  1-E Site Remediation Contribution was not made on September 30, 2008 and also the primary reason that the NJMC brought the instant motion.

As permitted by the Phase 2 Purchase Agreement, the NJMC has been operating the Baler Site as a solid waste transfer station under a permit jointly issued to it and Waste Management, Inc. ("WMI").  WMI leases the Baler Site from the NJMC and conducts the transfer station operation. The WMI lease ends December 31, 2008, which the NJMC believes is required by § 4.3.1 of the Phase 2 Purchase Agreement.[1]

The NJMC cites the termination of the operation of the solid waste transfer station at the Baler Site as another basis for its motion.  The NJMC contends that it is unfair for the EnCap

---

[1]Section 4.3.1 provides in pertinent part that "NJMC shall cease all solid waste operations at the Baler Site on the earliest date practicable, but in no event shall be obligated to do so prior to December 31, 2008.  NJMC hereby agrees that no new contractual agreements or extensions of existing agreements shall be executed permitting solid waste activities or operations to occur on the Baler Site from December 31, 2008 until the Baler Site Closing Date."

payment default to continue while the NJMC honors its obligations to refrain from entering into new contracts for solid waste activities.  Presumably to illustrate the full measure of the inequity, the NJMC also points out that the Borough of North Arlington will suffer a significant loss of revenue from the cessation of the WMI contract.  The NJMC estimates that the Borough has received approximately $1,000,000 annually as its share of the fees generated from the operation of the solid waste transfer station and $1,000,000 annually as "host community benefits" from operations at the 1-E Landfill.  Further, the NJMC estimates that the Borough has realized annual cost savings of approximately $600,000 because the Borough is not charged for its municipal solid waste brought to the Baler Site.[2]

Finally, the NJMC points out that  EnCap filed its Chapter 11 case on May 8, 2008 and that its Disclosure Statement and Plan, filed on September 30, 2008 do not specifically address the Phase 2 Project Site at all.  In particular, it notes that the Disclosure Statement recounts that the purpose for the bankruptcy is to preserve the Third Amended Development Agreement relating to the Phase 1 Project Site.  Similarly, it notes that the competing plan of reorganization filed by the Trump Organization also does not address the Phase 2 Project Site or the Phase 2 Purchase Agreement. From these facts the NJMC concludes that EnCap's future plans do not include the Phase 2 Project Site.

EnCap, its Creditors' Committee and Cherokee argue that EnCap should not be required to assume or reject the Phase 2 Purchase Agreement prior to the confirmation hearing.  They contend that the EnCap case is at a critical juncture because competing plans have been filed and the

---

[2]The effect of these statements is undercut by the NJMC's failure to provide any source for the figures it quotes.  Further, it concedes that the 1-E Landfill Site has reached its capacity and that if assumed, the Phase 2 Purchase Agreement provides for the Baler Site to be closed by December 31, 2009.

respective disclosure statements are scheduled for a hearing date.[3]  In particular, EnCap argues that

it should not be forced to make a premature decision regarding the Phase 2 Purchase Agreement.

It believes it must know whether the Trump Organization or another potential developer will require

assumption and assignment of the Phase 2 Purchase Agreement.  Further, EnCap claims that the

NJMC's concern for the Borough of North Arlington is illusory.  It asserts, upon information and

belief, that the NJMC's true plan is to use the Phase 2 Project Site as a regional trash facility.


### DISCUSSION

In a Chapter 11 case, § 365 of the Bankruptcy Code grants a trustee or debtor-in-possession

considerable discretion to decide when to assume or reject an executory contract.  It affords these

parties the opportunity to assume or reject a contract "at any time before the confirmation of a plan."

11 U.S.C. § 365(d)(2).  However, a debtor's discretion is not unfettered as the same section provides

that, "on request of any party to such contract or agreement",  the court "may order the [debtor-in-

possession] to determine within a specified period of time whether to assume or reject such contract

or lease."  *Id.*

The determination of what constitutes a reasonable period of time for a debtor to assume or

reject a contract is within the bankruptcy court's discretion in light of the circumstances of the

particular case.  *In re Dunes Casino Hotel*, 63 B.R. 939, 949 (D.N.J. 1986)(citing *Theatre Holding*

*Corp. v. Mauro*, 681 F.2d 102, 105 (2d Cir. 1982)).

In exercising its discretion, the bankruptcy court essentially balances the interests of the

bankruptcy estate and its creditors against the interests of the movant.  Moreover, the rehabilitative

purpose of Chapter 11 should be considered by the court when deciding what constitutes reasonable

---

[3]When this motion was heard the disclosure statements were scheduled for hearing on
December 30, 2008.  The hearing is presently adjourned to January 27, 2008.

time for acceptance or rejection of a contract.  *In re Teligent,* 268 B.R. 723, 738-39 (Bankr.

S.D.N.Y. 2001).  In light of this rehabilitative purpose, courts frequently permit a debtor to wait until

late in its case to make a decision to assume or reject a contract.  The rationale underlying this

approach is that it gives a debtor the fullest opportunity "to carefully evaluate the possible benefits

and burdens of an executory contract."  *In re Kmart Corp.,* 290 B.R. 614, 619 (Bankr. N.D. Ill.

2003).  However, the court in *Kmart* also noted that in exercising its discretion the court properly

considers the interests of the nondebtor party to the contract.  *Id.*

In general, when determining whether to impose a deadline courts consider factors such as

(i) the nature of the interests at stake, (ii) the balance of the hurt the litigants, (iii) the good to be

achieved, (iv) the safeguards afforded the litigants and (v) whether the action to be taken is so in

derogation of the statutory scheme that the court may be said to be arbitrary.  *In re G-1 Holdings,*

*Inc.*, 308 B.R. 196, 213 (Bankr. D.N.J. 2004)(citing *Dunes* 63 B.R. at 949 (citations omitted)).  The

court finds factors (i) , (ii), and (iv) stated above to be of paramount importance in adjudicating this

motion.


A.    **NATURE OF INTERESTS**

Purely as a monetary matter, this factor weighs largely in favor of EnCap.  The Phase 2

Purchase Agreement contains ample evidence of the value that EnCap ascribes to the Phase 2 Project

Site.  Pursuant to its terms, EnCap has agreed to pay $1,000,000 for the Baler Site and to make

payments totaling $33,700,000 in connection with its 99-year lease of the 1-E Landfill Site.  The

NJMC's contractual obligation to cease operations at the Baler Site and close the 1-E Landfill is also

valuable.  Additionally, except for the Third Amended Development Agreement, each development

agreement preserved EnCap's interest in the Phase 2 Project Site.  This indicates to the court that

EnCap has long considered the Phase 2 Project a significant asset.   Further, the court agrees with

EnCap that it is reasonable to expect that the proximity of the Phase 2 Project Site to the Phase 1 Project Site makes it likely that any potential developer of the Phase 1 Project Site will likely be interested in the Phase 2 Project Site.

The immediate nature of the NJMC's interest is much harder to discern.  It denies that it seeks rejection of the Phase 2 Purchase Agreement in order to establish a regional trash facility.  The NJMC asserts that it stands ready to continue to satisfy all of its obligations under the Phase 2 Purchase Agreement if EnCap decides to assume the agreement.  If that is the case, it seems to the court that a more efficacious (and less expensive) course of action would have been to request a status conference with the court and interested parties to fix firm dates for completing the disclosure statement hearings and the confirmation hearings for the plans of reorganization that were filed in September 2008.  However, the court must also acknowledge that, by statute, the NJMC is charged with the responsibility to reclaim and redevelop the Meadowlands for the benefit of the citizens of the State of New Jersey.  N.J.S.A. 13:17-1, *et seq.*  Plainly, The NJMC's contractual arrangements with EnCap have not met this goal.


**B.**      **BALANCE OF HURT AND GOOD TO BE ACHIEVED**

Encap's months in bankruptcy as well as its prefiling history cause these factors to weigh in favor of the NJMC.  EnCap has been a Chapter 11 debtor for over six months.  Moreover, as a practical matter, it has been attempting to restructure its obligations to the NJMC and others at least as of March 2003 when it entered into the Amended Development Agreement.  After two more amendments to the Original Development Agreement as well as execution of a Phase 2 MOA and a Phase 3 Purchase Agreement, in May 2008 EnCap filed for bankruptcy relief.  Its plan of reorganization is structured around obtaining a qualified contractor to finish remediation of the EnCap project and only thereafter to attract developers.

It has had several years outside of bankruptcy and several months under bankruptcy protection to evaluate the importance of the Phase 2 Project Site to completion of the remediation and development of the Phase 1 Project Site.  The hearings on the disclosure statement have been twice adjourned to afford EnCap more time.  By January 27, 2009, the third adjourned date EnCap will have enjoyed bankruptcy protection for almost nine months.  It is not unreasonable to expect that by January 27, 2009 EnCap should know what it wishes to do with the Phase 2 Purchase Agreement.

This time frame not only affords EnCap a reasonable opportunity for  making a decision if the agreement is rejected, but also gives the NJMC an opportunity to seek other means to remediate the Phase 2 Site.  In this regard, the court is mindful that not only the NJMC, but also the Borough of North Arlington are affected by the decision to assume or reject.  Unreasonably prolonging the time period in which EnCap makes a decision leaves the NJMC in limbo as to how the goal of remediating the Phase 2 Project will be met.

## C.    SAFEGUARDS AFFORDED THE LITIGANTS AND THE CONGRESSIONAL SCHEME

Unquestionably, the purpose of Chapter 11 is to rehabilitate debtors.  However, EnCap is not a traditional business.  It has only a couple of employees.  It does not  manufacture goods, sell goods or provide services. In short, its place in the New Jersey economy is not significant.  Moreover, EnCap does not contend that the Phase 2 Purchase Agreement is central to its reorganization.  Rather, EnCap states that the agreement might be of interest to a potential developer of the Phase 1 Project.  While this interest is enough to afford EnCap some additional time, it is not enough to extend the time to assume or reject the Phase 2 Purchase Agreement until the confirmation hearing.  Performance of the contract at issue here results in  the remediating and closing of landfill sites – a matter of concern not only to the NJMC, but also to the citizens of the Borough of North Arlington

and neighboring communities. This interest is at least as important as EnCap's interest in preserving the contract for sale.

Moreover, the NJMC is in the unenviable position of having to continue to meet its obligations regarding the Baler Site and the 1-E Landfill while EnCap has defaulted on its payment obligation. Notably, postpetition, EnCap failed to pay the $1,433,889 sum that was due in September 2008. EnCap has not indicated that it will make that payment or any other postpetition installments as they come due. This is a significant detriment to the NJMC. When balanced against the nature of EnCap's business it is evident that the lack of a specific time to assume or reject the Phase 2 Purchase Agreement is a greater detriment to the NJMC than it is a benefit to EnCap.

## **CONCLUSION**

For the reasons described above, EnCap's time to assume or reject the Phase 2 Purchase Agreement is Fixed as January 27, 2009.

Dated: December 24, 2008

_____
NOVALYN L. WINFIELD
United States Bankruptcy Judge